1   Matthew J. Langley (SBN 342846)
    matt@almeidalawgroup.com
2   **ALMEIDA LAW GROUP LLC**
    849 W. Webster Avenue
3   Chicago, Illinois 60614
    (773) 554-9354
4

5               **UNITED STATES DISTRICT COURT**

6               **NORTHERN DISTRICT OF CALIFORNIA**

7

8   CHARLOTTE VARGAS, *individually and on*          Case No.:
    *behalf of all others similarly situated*,
9                                                    **CLASS ACTION COMPLAINT FOR:**
                        Plaintiff,
10                                                   1. NEGLIGENCE
            v.                                       2. NEGLIGENCE PER SE
11                                                   3. BREACH OF CONTRACT
                                                     4. BREACH OF IMPLIED CONTRACT
12  TEA DATING ADVICE INC.,                          5. UNJUST ENRICHMENT
                                                     6. BREACH OF FIDUCIARY DUTY
13                      Defendant.                   7. CALIFORNIA CONSUMER PRIVACY
                                                        ACT, CAL. CIV. CODE § 1798.150 *et*
14                                                      *seq.*
                                                     8. CALIFORNIA UNFAIR
15                                                      COMPETITION LAW,  CAL. BUS &
                                                        PROF. CODE § 17200 *et seq.*
16                                                   9. DECLARATORY JUDGEMENT
17
18                                                   **JURY TRIAL DEMANDED**

19

20

21

22

23

24

25

26

27

28

-1-
CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Charlotte Vargas, on behalf of herself and all others similarly situated, through undersigned counsel, brings this Class Action against Defendant Tea Dating Advice Inc. d/b/a Tea or Tea App ("Defendant" or "Tea") and alleges, upon personal knowledge as to her own actions and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.      Plaintiff Charlotte Vargas brings this class action lawsuit on behalf of herself and a class of persons impacted by Defendant's failure to safeguard, monitor, maintain and protect highly sensitive personal information including but not limited to names, photographs, selfies, photo identification documents, and direct messages (collectively "Personally Identifiable Information" or "PII"), on behalf of individuals whose information was provided to Defendant in connection with use of Defendant's dating safety application and services.

2.      Ironically, Tea markets itself as a safe sanctuary where women can anonymously warn each other about dangerous and/or predatory men. Instead, in a catastrophic breach of its database of user verification data, Tea became the very danger it promised to protect its users against.

3.      On or about July 25, 2025, Tea discovered unauthorized access to its systems – after being alerted to it by media. Their subsequent investigation revealed that users of the notorious message board 4Chan got a hold of and leaked online Tea users' sensitive data (for users who signed up  prior to February 2024). The leaked data contained approximately 72,000 user images, including approximately 13,000 selfies and photo identification documents such as government IDs submitted by users during account verification, and approximately 59,000 images publicly viewable in the app from posts, comments and direct messages (the "Data Breach").[1]

4.      Online trolls  - who have been clamouring on 4Chan boards for someone to hack Tea prior to the Data Breach - also claimed to have sourced the metadata included in the photos and used it to make a map of Tea subscribers' locations.[2] Someone created a site for comparing and

---

[1] *Dating Safety App "Tea" Hit by Massive Data Leak: Thousands of Women's IDs and Personal Information Exposed*, DoControl (July 30, 2025), https://www.docontrol.io/blog/dating-safety-app-tea-hit-by-massive-data-leak (last accessed August 6, 2025).

[2] *Tea encouraged its users to spill. Then the apps' data got leaked*, Culture (August 2, 2025), https://www.npr.org/2025/08/02/nx-s1-5483886/tea-app-breach-hacked-whisper-networks.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

ranking the users' physical appearances, and posters across social-media platforms began sharing Tea users' images, insulting the women's appearances and stating that "they deserved all of this."[3]

5.      As news of the leak spread, on July 28, 2025, 404 Media reported that a second security issue had enabled access to more than 1.1 million Tea user direct messages, spanning from early 2023 to about July 25, 2025. Some of those messages contained intimate and highly sensitive personal information that made it easy to find users' identities, according to the report.[4]

6.      The data leak did not stop at 4Chan, with users of X Corp.'s platform (formerly Twitter) amplifying the breach, with X users creating searchable databases linking women's real identities to their anonymous posts. "The drivers licenses leaked today from the tea app have been uploaded to a searchable map. . . this may be the worst PII Leak I've ever seen lol," one such X user posted.

7.      The Tea app, which meant to be protecting vulnerable women from abusers, serial cheaters and sexual predators, became a weapon in the hands of those who want to do these women harm.

8.      This catastrophic leak happened not because a sophisticated hacker managed to break into Tea's database, but because Tea's negligence was so egregious that it stored its most sensitive user data in a Google Firebase storage bucket *configured for completely public access*.[5] In fact Firebase security misconfigurations are so common, they've become a running joke in the cybersecurity community.[6] In short, Tea and its employees are so incompetent that they did not even check their Firebase storage bucket settings.

---

[3] *First Came Tea. Then Came the Male Rage*, The Atlantic (July 30, 2025), https://www.theatlantic.com/family/archive/2025/07/tea-app-dating-data-breach-misogyny/683712/
[4] *A Second Tea Breach Reveals Users' DMs About Abortions and Cheating*, 404 Media (July 28, 2025), https://www.404media.co/a-second-tea-breach-reveals-users-dms-about-abortions-and-cheating/
[5] *See Security Rules for Cloud Storage*, Google Cloud, *Firebase Documentation*, https://firebase.google.com/docs/storage/security
[6] *See* Dylan Curran, *Tea App That Claimed to Protect Women Exposes 72,000 IDs in Epic Security Fail*, Decrypt (July 26, 2025), https://decrypt.co/331961/tea-app-claimed-protect-womenexposes-72000-ids-epic-security-fail

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

9.     Plaintiff and Class Members now face a substantial and imminent risk of identity theft, harassment, stalking, physical assault, cyberbullying, and other personal, physical, social, and financial harms that may persist for life.

10.    As a direct and proximate result of Tea's shocking security failures, Plaintiff's and Class Members' Private Information is now in the hands of unauthorized parties, the very predators they sought to avoid.

11.    Plaintiff and Class Members therefore suffer, and continue to face, ascertainable losses, including heightened risk of identity theft, out-of-pocket mitigation costs, lost time, diminished value of their Private Information, impending risk of fraud, identity theft, harassment, and dissemination of their data on websites including 4Chan and X, and likely the dark web.

12.    Plaintiff and Class Members have already suffered concrete injuries in fact, including loss of data value, time and opportunity costs, anxiety, and must now devote additional time, money, and effort to monitor accounts, protect their identities, and otherwise safeguard themselves.

13.    On behalf of the Class, Plaintiff asserts claims for (i) Negligence; (ii) Negligence Per Se; (iii) Breach of Contract; (iv) Breach of Implied Contract; (v) Unjust Enrichment; (vi) Breach of Fiduciary Duty; (vii) Declaratory Judgment; (viii) Violations of the California Consumer Privacy Act, Cal. Civ. Code § 1798.150 *et seq.*; and (ix) Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* Plaintiff seeks damages, restitution, and injunctive relief, including Court-ordered implementation of industry-standard information-security measures, regular security audits, and long-term identity theft protection services to prevent future breaches.

## PARTIES

14.    Plaintiff Charlotte Vargas is, and at all times relevant hereto was, an adult citizen of the State of California residing in Clovis, California.

15.    Defendant Tea Dating Advice Inc. d/b/a Tea or Tea App, is a Delaware corporation with its principal place of business at 201 Spear Street, Suite 1100, San Francisco, California 94105.

**JURISDICTION AND VENUE**

16.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (a) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) members of the proposed class are citizens of states different from Defendant; and (c) the number of proposed class members exceeds 100.

17.    This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District and has sufficient minimum contacts with this District.

18.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendant maintains its principal place of business and conducts substantial business in this District.

**COMMON FACTUAL ALLEGATIONS**

**A.  Defendant Collected, Maintained and Stored PII**

19.    Defendant operates a dating safety application marketed to women that provides tools to verify the identity of potential romantic partners, including reverse image search features to detect catfishing, phone number lookups to check for hidden marriages, and background checks to identify criminal records.

20.    Plaintiff and Class Members are current and former users who signed up for and used Tea's dating safety services.

21.    In order to receive those services, users—including Plaintiff and Class Members—were required to provide Tea with sensitive PII including selfies for identity verification, photo identification documents, and other highly sensitive personal information.

22.    Tea represented—through its privacy policy, terms of service, and other disclosures—that it would maintain that information in strict confidence and employ reasonable safeguards to protect it. Specifically, Defendant's privacy policy states: "Tea Dating Advice takes reasonable security measures to protect your Personal Information to prevent loss, misuse, unauthorized access, disclosure, alteration, and destruction."[7]

---

[7] *Privacy Policy*, https://www.tea-dating.com/privacy (last visited August 6, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

23.     Given the highly sensitive nature of the information it collects, particularly photo identification and verification images, Tea is obligated to (a) keep users' Private Information confidential; (b) follow industry-standard data-security practices; (c) inform users of its data-security duties; (d) comply with all applicable federal and state privacy laws; (e) use or disclose the data only for legitimate safety verification purposes; and (f) provide prompt notice of any unauthorized disclosure.

24.     By obtaining and benefiting from Plaintiff's and Class Members' Private Information, Tea assumed legal and equitable duties to protect that data from unauthorized access or disclosure.

25.     Without the submission of such data, Tea could not perform the dating safety and verification services it offers.

26.     Plaintiff and Class Members reasonably relied on Tea to maintain their Private Information securely and to disclose it only as authorized. Tea ultimately failed to honor these duties.

27.     On or about July 25, 2025, Tea (after being alerter to the hack by media reports) identified unauthorized access to its systems and launched an investigation with assistance from external cybersecurity experts.[8]

28.     The investigation revealed that Tea's data storage system was compromised, resulting in unauthorized access to users' dataset from prior to February 2024.[9]

29.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the PII it was maintaining for Plaintiff and Class Members, causing the exposure of Private Information.

30.     In fact, unaothrized actors were able to access and leak Tea users' PII because Tea stored its most sensitive user data in a Google Firebase storage bucket configured for completely public access.

---

[8] *Dating Safety App "Tea" Hit by Massive Data Leak: Thousands of Women's IDs and Personal Information Exposed*, *supra* n. 1
[9] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

31.     The unauthorized party accessed and acquired files in Defendant's systems containing unencrypted PII of Plaintiff and Class Members. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

32.     Defendant has attempted to shift responsibility for its failure to protect Plaintiff's and Class Members' Private Information to the victims of the Data Breach, advising in its Notice that users should take protective measures while simultaneously claiming that users who signed up after February 2024 were unaffected.[10]

**B. Defendant's Data Breach Exposed PII**

33.     Defendant derives a substantial economic benefit from its dating safety operations, which rely on thousands of user relationships through which Defendant requires, collects, and stores Plaintiff and Class Members' PII.

34.     Defendant was well aware that the PII it collects—including photo identification documents and verification selfies—is highly sensitive and of significant value to those who would use it for wrongful purposes including identity theft, harassment, stalking, and cyberbullying.

35.     Defendant also knew that a breach of its systems would result in the increased risk of identity theft, harassment, and fraud against the individuals whose PII was compromised.

36.     These risks are not merely theoretical; in recent years, numerous high-profile data breaches have occurred at technology companies and applications, particularly those handling sensitive user photographs and identification documents. The prevalence of data breaches and identity theft has increased dramatically in recent years. In 2023 alone, data breaches in the United States increased by 78% over 2022, reaching 3,205 reported breaches.[11]

37.     PII including photographs and identification documents has considerable value and constitutes an enticing and well-known target to hackers, who can easily sell stolen data or use it for harassment and extortion purposes.

---

[10] *Id.*

[11] Identity Theft Resource Center, *2023 Annual Data Breach Report* (2024), https://www.idtheftcenter.org/publication/2023-annual-data-breach-report/ (last viistd August 7, 2025).

38.    Dating and social applications have become prime targets for threat actors due to the sensitive nature of the data they store, including intimate photographs and personal communications that can be used for extortion and harassment.

39.    Photo identification documents, when combined with other PII, can be used to create synthetic identities, open new lines of credit, submit false applications for loans or benefits, and engage in sophisticated identity theft schemes.

40.    The breadth of data compromised in the Data Breach—including approximately 72,000 images with 13,000 containing selfies and photo IDs—makes the information particularly valuable to thieves and leaves Defendant's users especially vulnerable to identity theft, harassment, and cyberstalking.[12]

41.    Stolen photo identification and verification images are particularly valuable on the black market as they can be used to bypass identity verification systems on financial platforms, cryptocurrency exchanges, and other services requiring identity verification.[13]

42.    Identity thieves can use stolen personal information including photo identification for a variety of crimes, including opening financial accounts, obtaining government benefits, creating synthetic identities, and engaging in romance scams using victims' photos.

43.    Photo identification documents are among the worst kind of information to have been stolen because they provide comprehensive identity verification that can defeat many security systems.

44.    There may be a substantial time lag between when harm occurs and when it is discovered, particularly when photo identification is used to create synthetic identities that may not be discovered for years.

45.    Based on the value of its users' PII to cybercriminals, Defendant certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

---

[12] *Id.*
[13] *See A Look into the Pricing of Stolen Identities for Sale on Dark Web,* SECURITY MAG. (Jan. 21, 2021), https://www.securitymagazine.com/articles/94405-a-look-into-the-pricing-of-stolen-identities-for-sale-on-dark-web (last visited August 6, 2025)

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**C. Defendant Knew or Should Have Known of the Risk Because Institutions in Possession of PII**

46.     Given that Defendant was storing the PII of Plaintiff and Class Members, including highly sensitive photo identification documents, and knew or should have known of the serious risk and harm caused by a data breach, Defendant was obligated to implement reasonable measures to prevent and detect cyber-attacks.

47.     That obligation stems from the foreseeable risk of a data breach given that Defendant collected, stored, and had access to a wealth of highly sensitive personal records including government-issued identification documents.

48.     Indeed, cyberattacks targeting applications that store photo identification have become so notorious that federal agencies have issued specific warnings about the risks of storing such data without adequate protection.[14]

49.     Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and therefore to anyone in Defendant's industry, including Defendant.

50.     Despite the abundance and availability of information regarding cybersecurity best practices and the prevalence of data breaches, Defendant inexplicably failed to adopt sufficient data security processes by, without limitation:

    a.  Failing to properly implement adequate access controls and monitoring systems;

    b.  Failing to ensure the proper monitoring and logging of network traffic;

    c.  Failing to ensure the proper monitoring and logging of file access and modifications;

    d.  Failing to properly encrypt sensitive data including photo identification documents;

    e.  Failing to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members;

---

[14] Fed. Trade Comm'n, *FTC Warns About Misuses of Biometric Information and Harm to Consumers* (May 18, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-warns-about-misuses-biometric-information-harm-consumers (last visited August 6, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

f. Failure to timely and accurately disclose that Plaintiff's and Class Members' PII had been improperly acquired or accessed;

g. Knowingly disregarding standard information security principles by maintaining legacy systems with inadequate security measures;

h. Failing to provide adequate supervision and oversight of the PII with which they were entrusted.

51. Upon information and belief, Defendant further failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data security incidents, particularly given that the compromised data was stored in a legacy data storage system.

52. Time is of the essence when PII including photo identification is subject to unauthorized access and/or acquisition.

53. The disclosed, accessed, and/or acquired PII of Plaintiff and Class Members is, upon information and good faith belief, already available on the various online forums including 4Chan and X.

54. Hackers can access and then offer for sale the unencrypted, unredacted PII including photo identification to criminals.

55. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, harassment, and misuse resulting from the publication of their PII including photographs onto the various websites including 4Chan and X.

56. Plaintiff and Class Members now face a lifetime risk of identity theft and harassment, which is heightened here by the exposure of photo identification documents.

57. Despite the highly sensitive nature of the information that Defendant obtained, maintained, and stored—particularly photo identification documents—and the prevalence of data breaches, Defendant inexplicably failed to take appropriate steps to safeguard the PII of Plaintiff and Class Members from being compromised.

58. The Data Breach itself demonstrates Defendant failed to implement reasonable measures to prevent cyber-attacks and exposure of the PII it oversaw.

-10-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**D. Defendant Failed to Comply with FTC Guidelines.**

59.     The FTC recognizes that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[15]

60.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

61.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for business.

62.     Those guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[16]

63.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[17]

64.     The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business.

---

[15] Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable (last visited August 6, 2025).

[16] *Protecting   Personal   Information:   A   Guide   for   Business*   (2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited August 6, 2025).

[17] *Start   with   Security:   A   Guide   for   Business*   (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited August 6, 2025).

65.     According to the FTC, reasonable data security protocols require:

    a.     Encrypting the information stored on computer networks;

    b.     Retaining payment card information only as long as necessary;

    c.     Properly disposing of personal information that is no longer needed or can be disposed pursuant to relevant state and federal laws;

    d.     Limiting administrative access to business systems;

    e.     Using industry approved activity;

    f.     Monitoring activity on networks to uncover unapproved activity;

    g.     Verifying that privacy and security features function properly;

    h.     Testing for common vulnerabilities; and

    i.     Updating and patching third-party software.[18]

66.     The FTC cautions businesses that failure to protect PII and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect.[19] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures-like Defendant failed to do here-as an unfair act prohibited by Section 5(a) of the FTC Act.

67.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act of practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

68.     Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

69.     Defendant failed to properly implement basic data security practices.

---

[18] *Id.*
[19] *See Taking Charge, What to Do if Your Identity is Stolen*, at 3 (Jan. 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited August 6, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

70.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customer's PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

71.     Plaintiff alleges upon information and good faith belief, that Defendant was at all times fully aware of the obligation to protect the PII of their employees and customers. Defendant was also aware of the significant repercussions that would result from their failure to do so.

**E.  Defendant Failed to Comply with Industry Standards.**

72.     As shown above, experts studying cybersecurity routinely identify large companies like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

73.     Several best practices have been identified that at a minimum should be implemented by companies like Defendant, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limited which employees can access sensitive data.

74.     The United States Government and the United States Cybersecurity & Infrastructure Agency recommend several similar and supplemental measures to prevent and detect cyberattacks, including, but not limited to: implement an awareness and training program, enabling strong spam filters, scanning incoming and outgoing emails, configuring firewalls, automating anti-virus and anti-malware programs, managing privileged accounts, configuring access controls, disabling remote desktop protocol, and updating and patching computers.

75.     Other best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

76.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1[20] (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet's Critical Security Controls[21] (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

77.    The FBI's Internet Crime Complaint (IC3) 2019 estimated that there was more than $3.5 billion in losses to individual and business victims due to identity fraud in that year alone. That same report identified "rapid reporting" as a tool to help law enforcement stop fraudulent transactions and mitigate losses.[22]

78.    These foregoing frameworks are existing and applicable industry standards, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**F.  The Data Breach Resulted from Defendant's Failure to Properly Maintain and Safeguard Their Systems and Data.**

79.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data.

80.    Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.  Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b.  Failing to adequately protect employees' and customers' PII;

---

[20] Nat'l Inst. of Standards & Tech., *Framework for Improving Critical Infrastructure Cybersecurity*(2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf (last visited August 6, 2025).

[21] *See The 18 CIS Critical Security Controls*, https://www.cisecurity.org/controls/cis-controls-list (last visited August 6, 2025).

[22] *See 2019 Internet Crime Report*, https://www.ic3.gov/AnnualReport/Reports/2019_ic3Report.pdf (last visited August 6, 2025).

c.  Failing to properly monitor its own data security systems for existing intrusions;

d.  Failing to ensure that their vendors with access to their computer systems employed reasonable security procedures;

e.  Failing to detect unauthorized ingress into their systems;

f.  Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within their systems, including to and from areas containing the most sensitive data;

g.  Failing to detect unauthorized exfiltration of the most sensitive data on their systems;

h.  Failing to train their employees in the proper handling of emails containing PII and maintain adequate email security practices;

i.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

j.  Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' PII.

81.    Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII. Accordingly, as outlined below, Plaintiff and Class Members now face actual fraud and identity theft as well as increased risk of fraud and identity theft. In addition, Plaintiff and Class Members lost the benefit of the bargain they made with Defendant.

**G.  Cyberattacks and Data Breaches Cause Disruption and Put Victims at an Increased Risk of Fraud and Identity Theft.**

82.    Cyberattacks and data breaches at companies like Defendant's are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

83.    The United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[23]

84.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it.

85.    They do this by selling the spoils of their cyberattacks on the black market to identify thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate piece of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim.

86.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique called "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security Number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

87.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steal their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[24]

---

[23] *See* GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, at 2 (2007), https://www.gao.gov/new.items/d07737.pdf ("GAO Report") (last visited August 6, 2025).

[24] *See IdentityTheft.gov/Steps,* "https://www.identitytheft.gov/steps" (last visited August 6, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

88.     Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

89.     Moreover, theft of PII is also gravely serious because PII is an extremely valuable property right.[25]

90.     Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.[26]

91.     There may additionally be a substantial time lag—measured in years—between when harm occurs and when it is discovered, and also between when PII and/or financial information is stolen and when it is used.

92.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[27]

93.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black- market" for years.

94.     There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

95.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at the cybersecurity firm RedSeal, explained, "[c]ompared to credit

---

[25] *See, e.g.,* John T. Soma *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 Rich J.L. & Tech. 11, at 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets." (citations omitted).
[26] *Id.*
[27] *The GAO Report*, *supra* at 16.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[28]

96.     For this reason, Defendant knew or should have known about these dangers and strengthened its data systems and data security measures accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**H. Plaintiff's and Class Members' Damages.**

97.     Upon information and good faith belief, Plaintiff and Class Members have been damaged by the compromise of their PII in the Data Breach.

98.     Plaintiff's and Class Members' PII was compromised in the Data Breach and is now in the hands of cybercriminals who accessed the data Defendant held within its legacy systems. The PII exposed included names, photographs, selfies, photo identification documents, and direct messages.

99.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud, identity theft, and harassment.

100.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach, valuable time Plaintiff and Class Members otherwise would have spent on other activities, including but not limited to work and/or recreation.

101.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names using their photo identification, synthetic identities created with their verification documents, and harassment using their photographs.

---

[28] Tim Greene, *Anthem hack: Personal Data stolen sells for 10x price of stolen credit card numbers* (Feb 6. 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html  (last visited August 6, 2025).

-18-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

102.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, harassment, stalking, and other illegal schemes based on their exposed photographs and identification documents.

103.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as identity monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

104.    Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach.

105.    Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members who are users of Defendant overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards.

106.    Part of the price Plaintiff and Class Members paid to Defendant was intended to be used by Defendant to fund adequate data security practices to safeguard Plaintiff's and Class Members' PII.

107.    As demonstrated by the Data Breach, Defendant failed to fund and provide adequate data security practices. Thus, Plaintiff and the Class and California Subclass Members did not get what they paid for and agreed to.

108.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably spent to remedy or mitigate the effects of the Data Breach.

109.    Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards.

110.    Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their PII—including their photographs and identification documents— may be disclosed to the entire world, thereby subjecting them to embarrassment, harassment, and depriving them of any right to privacy whatsoever.

111.    As a direct and proximate result of Defendant's actions and omissions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

**REPRESENTATIVE PLAINTIFF CHARLOTTE VARGAS' EXPERIENCE**

112.    Plaintiff Charlotte Vargas signed up for Defendant's Tea dating safety application on or around July 5, 2025, to utilize the app's safety features for verifying potential romantic partners.

113.    As a condition of obtaining services from Defendant, she was required to provide her PII to Defendant, including submitting a selfie and photo identification for account verification purposes.

114.    Defendant maintained Plaintiff's PII, including her name and pictures of herself, in its systems at the time of the Data Breach.

115.    On or around July 27, 2025, Plaintiff was notified directly through the Tea application of the Data Breach, specifically informing her that her name and picture had been compromised in the unauthorized access.

116.    Plaintiff is very careful about sharing her sensitive PII, particularly photo identification documents. She stores any documents containing PII in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII, including her photo identification, to Defendant had she known of Defendant's lax data security policies and use of legacy systems.

117.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing identity theft protection services, monitoring for misuse of her photographs online, and checking for any fraudulent activity using her identification. Plaintiff has spent significant time dealing with the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

118.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII including photo identification; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) anxiety about potential harassment or stalking using her photographs; (vii) the continued and certainly increased risk to her PII, which remains unencrypted and available for unauthorized third parties to access and abuse; and (viii) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

119.    Plaintiff additionally suffered actual injury in the form of her PII, including her photograph and identification, being disseminated, on information and belief, on the various websites as a result of the Data Breach.

120.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

121.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft, fraud, and harassment for years to come.

122.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## **CLASS ACTION ALLEGATIONS**

123.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated.

124.    Plaintiff seeks to represent the Nationwide Class which is defined as follows:

> All individuals residing in the United States whose PII was compromised by the Data Breach (the "Class").

125.    Plaintiff also seeks to represent the California Subclass which is defined as follows:

> All individuals residing in the California whose PII was compromised by the Data Breach.

126.    Collectively, the Nationwide Class and the California Subclass are referred to herein as the Classes.

127.    The following people are excluded from the Classes: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and its current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

128.    **Numerosity**: The exact number of members of the Classes is unknown but, based on Defendant's disclosure of approximately 72,000 compromised images affecting users who signed up before February 2024, it is estimated to number in the thousands of hundreds, and individual joinder in this case is impracticable. Members of the Classes can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach class action controversies.

129.    **Typicality**: Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff, and the members of the Classes, sustained damages arising out of Defendant's Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

130.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of The Classes and have retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with, or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

131.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any

-22-

questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

    a. Whether Defendant violated the laws asserted herein, including statutory privacy laws;

    b. Whether Defendant had a duty to use reasonable care to safeguard Plaintiff's and Class Members' PII, particularly photo identification documents;

    c. Whether Defendant breached the duty to use reasonable care to safeguard Plaintiff's and Class Members' PII;

    d. Whether Defendant breached its contractual promises to safeguard Plaintiff's and Class Members' PII;

    e. Whether Defendant knew or should have known about the inadequacies of its data storage system;

    f. Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff's and Class Members' PII from unauthorized release and disclosure;

    g. Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to safeguard and protect Plaintiff's and Class Members' PII from unauthorized release and disclosure;

    h. Whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

    i. Whether Defendant's method of informing Plaintiff and other members of The Classes was reasonable;

    j. Whether Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

    k. Whether Plaintiff and members of The Classes were damaged as a proximate cause of the Data Breach;

    l. What the proper measure of damages is; and

m. Whether Plaintiff and members of The Classes are entitled to restitutionary, injunctive, declaratory, or other relief.

132. **Superiority**: This cause is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of The Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of The Classes to obtain effective relief from Defendant's misconduct. Even if members of The Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

133. A class action is superior to individual litigation because:

a. The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of The Classes action procedural device;

b. Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c. The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

134. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

a.  Whether Defendant failed to timely and adequately notify the public of the Data Breach;

b.  Whether Defendant owed a legal duty to Plaintiff and The Classes to exercise due care in collecting, storing, and safeguarding their PII;

c.  Whether Defendant's security measures to protect its data systems, particularly legacy systems, were reasonable in light of best practices recommended by data security experts;

d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendant failed to take commercially reasonable steps to safeguard PII in its possession; and

f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

135.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and information affected by the Data Breach. Class Members have already been preliminarily identified and notified of the Data Breach through Defendant's application.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Negligence**
**_(On Behalf of Plaintiff & the Class)_**

136.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

137.    Defendant required its users, including Plaintiff and Class Members, to submit their PII including photo identification, to obtain dating safety verification services from Defendant.

138.    By collecting and storing this data in its computer system and network, and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

safeguard its computer system—and Plaintiff's and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

139.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, including legacy systems, adequately protected the PII.

140.    Plaintiff and The Classes are a well-defined, foreseeable, and probable group of users that Defendant was aware, or should have been aware, could be injured by inadequate data security measures.

141.    A large repository of highly valuable personal information including photo identification is a foreseeable target for cybercriminals looking to steal and profit from that PII. Defendant knew or should have known that its repository of photo identification and verification documents posed a significant risk of being targeted for a data breach.

142.    After all, PII including photo identification is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, and storing the PII of Plaintiff and Class Members, particularly in legacy systems.

143.    Defendant's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendant and its users, which is recognized by laws and regulations, as well as common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

144.    In addition, Defendant has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

145.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

146.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

    b.    Failing to adequately monitor the security of its networks and systems, particularly legacy systems;

    c.    Failing to properly encrypt photo identification and verification documents;

    d.    Allowing unauthorized access to Plaintiff's and Class Members' PII;

    e.    Failing to detect in a timely manner that Plaintiff's and Class Members' PII had been compromised; and

    f.    Failing to provide adequate and timely notice to Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

142.    Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class or California subclass Members' PII by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite the known risk of data breaches, and allowing unauthorized access to Plaintiff's and Class Members' PII.

143.    The failure of Defendant to comply with industry standards and federal regulations evidences Defendant's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII.

144.    But for Defendant's wrongful and negligent breach of its duties to Plaintiff and Class Members, their PII would not have been compromised, stolen, and viewed by unauthorized persons.

Defendant's negligence was a direct and legal cause of the theft of the PII of Plaintiff and Class Members and all resulting damages.

145.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' PII would result in injury to Plaintiff and Class and Subclass Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

146.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class and Subclass Members' PII would result in one or more types of injuries to Plaintiff and Class and Subclass Members.

147.    As a result of this misconduct by Defendant, the PII of Plaintiff and Class and Subclass Members was compromised, placing them at a greater risk of identity theft and of their PII being disclosed to third parties without the consent of Plaintiff and the Class.

148.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

149.    Plaintiff and Class and Subclass Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class and Subclass Members.

**SECOND CAUSE OF ACTION**
**Negligence *Per Se***
**_(On Behalf of Plaintiff & the Class)_**

150.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

151.    Plaintiff alleges this negligence per se theory as alternative to Count I.

152.    Pursuant to the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, Defendant has a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII. Specifically, this statute prohibits "unfair . . .

practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data.

153.   Moreover, Plaintiff and Class Members' injuries are precisely the type of injuries that the FTCA guards against. After all, the FTC has pursued numerous enforcement actions against businesses that—because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices—caused the very same injuries that Defendant inflicted upon Plaintiff and Class Members.

154.   Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect PII.

155.   Defendant owed Plaintiff and Class Members a duty to notify them within a reasonable time frame of any breach to their PII. Defendant also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of Defendant's Data Breach.

156.   Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from its inadequate security protocols.

157.   Defendant breached its duties to Plaintiff and Class Members under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII. And but for Defendant's negligence, Plaintiff and Class Members would not have been injured. The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

b.   Failing to comply with—and thus violating—FTCA and its regulations;

c.   Failing to adequately monitor the security of its networks and systems;

d.  Maintaining sensitive data in legacy systems without adequate protection;

e.  Allowing unauthorized access to Plaintiff's and Class Members' PII;

f.  Failing to detect in a timely manner that Plaintiff's and Class Members' PII had been compromised; and

g.  Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

158.  Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

159.  But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

160.  The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

161.  Simply put, Defendant's negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injuries-in-fact and damages. These injuries include, but are not limited to, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence. Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

162.  As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

163.  Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

### THIRD CAUSE OF ACTION
**Breach Of Contract**
***(On Behalf of Plaintiff & the Class)***

164.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

165.    Defendant required Plaintiff and Class Members to provide and entrust their PII, including photo identification, as a condition of obtaining services from Defendant.

166.    Plaintiff and Class Members paid money to Defendant, directly and/or indirectly, in exchange for services as well as Defendant's promise to protect their PII from unauthorized disclosure.

167.    Defendant promised to comply with legal and industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

168.    Implicit in the agreement between Defendant and Plaintiff and Class Members was the obligation that both parties would maintain the PII confidentially and securely.

169.    Defendant had implied duties of good faith to ensure that the PII of Plaintiff and Class Members in their possession was used only as authorized.

170.    Defendant had implied duties to protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses.

171.    Additionally, Defendant implicitly promised to retain this PII only under conditions that kept such information secure and confidential.

172.    Through their course of conduct, Defendant, Plaintiff and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII.

173.    Defendant solicited and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

174.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant. Defendant did not. Plaintiff and Class Members would not have provided

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

their confidential PII to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their PII for uses other than obtaining benefits and services from Defendant.

175.    Defendant breached the implied contracts with Plaintiff and Class Members by failing to safeguard and protect Plaintiff's and Class Members' PII; failing to provide timely and accurate notice to Plaintiff and Class Members that their PII was compromised as a result of the Data Breach; and violating industry standards as well as legal obligations that are necessarily incorporated into implied contracts between Plaintiff, Class Members, and Defendant.

176.    Defendant's failures to meet these promises constitute breaches of the implied contracts.

177.    Furthermore, the failure to meet its confidentiality and privacy obligations resulted in Defendant providing services to Plaintiff and Class Members that were of a diminished value.

178.    Defendant's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their PII in exchange for services.

179.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer):

      a.    ongoing, imminent, and impending threat of identity theft crimes, fraud, harassment, and abuse, resulting in monetary loss and economic harm;

      b.    actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm;

      c.    loss of the confidentiality of the stolen confidential data;

      d.    the possibility of an illegal sale of the compromised data on the internet including websites such as 4Chan and X, and the dark web;

      e.    lost work time; and

      f.    other economic and non-economic harm.

180.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Contract**
*(On Behalf of Plaintiff & the Class)*

181.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

182.    Plaintiff brings this cause of action in the alternative to Count Three.

183.    Defendant required Plaintiff and Class Members to provide and entrust their PII as a condition of obtaining services from Defendant.

184.    Plaintiff and Class Members paid money to Defendant, directly and/or indirectly, in exchange for services as well as Defendant's promise to protect their PII from unauthorized disclosure.

185.    Defendant promised to comply with legal and industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

186.    Implicit in the agreement between Defendant and Plaintiff and Class Members was the obligation that both parties would maintain the PII confidentially and securely.

187.    Defendant had implied duties of good faith to ensure that the PII of Plaintiff and Class Members in their possession was used only as authorized.

188.    Defendant had implied duties to protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses.

189.    Additionally, Defendant implicitly promised to retain this PII only under conditions that kept such information secure and confidential.

190.    Through their course of conduct, Defendant, Plaintiff and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII.

191.    Defendant solicited and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

-33-

192.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant. Defendant did not. Plaintiff and Class Members would not have provided their confidential PII to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their PII for uses other than obtaining benefits and services from Defendant.

193.    Defendant breached the implied contracts with Plaintiff and Class Members by failing to safeguard and protect Plaintiff's and Class Members' PII; failing to provide timely and accurate notice to Plaintiff and Class Members that their PII was compromised as a result of the Data Breach; and violating industry standards as well as legal obligations that are necessarily incorporated into implied contracts between Plaintiff, Class Members, and Defendant.

194.    Defendant's failures to meet these promises constitute breaches of the implied contracts.

195.    Furthermore, the failure to meet its confidentiality and privacy obligations resulted in Defendant providing services to Plaintiff and Class Members that were of a diminished value.

196.    Defendant's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their PII in exchange for services.

197.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer):

    a.    ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm;

    b.    actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm;

    c.    loss of the confidentiality of the stolen confidential data;

    d.    the possibility of an illegal sale of the compromised data on the internet including websites such as 4Chan and X, and the dark web;

    e.    lost work time; and

    f.    other economic and non-economic harm.

-34-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

198.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
***(On Behalf of Plaintiff & the Class)***

199.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

200.    This claim is pleaded solely in the alternative to Plaintiff's breach of implied contract claim.

201.    Plaintiff and Class Members conferred a monetary benefit on Defendant by using Defendant as a dating safety service provider. A portion of the proceeds of this benefit was intended to have been used by Defendant for data security measures to secure Plaintiff and Class Members' PII. Plaintiff and Class Members further conferred a benefit on Defendant by entrusting their PII to Defendant from which Defendant derived profits.

202.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures including maintaining legacy systems. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide adequate security.

203.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

204.    Defendant acquired the monetary benefit and PII through inequitable means in that Defendant failed to disclose the inadequate security practices, as described herein, and failed to maintain adequate data security.

205. If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to disclose their data to Defendant.

206. Plaintiff and Class Members have no adequate remedy at law.

207. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered—and will continue to suffer—a host of injuries, including but not limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their PII is used; (3) the compromise, publication, and/or theft of their PII; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their possession; and (7) future expenditures of time, effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of Defendant's Data Breach.

208. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and data security practices alleged in this Complaint.

209. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Data Breach alleged herein.

### SIXTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
***(On Behalf of Plaintiff & the Class)***

210. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

-36-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

211.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardians of Plaintiff's and Class Members' PII including photo identification, Defendant became fiduciaries by their undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

212.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship with their users to keep secure their PII.

213.    Defendant breached their fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiff and The Classes in a reasonable and practicable period of time.

214.    Defendant breached their fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' PII, particularly photo identification documents.

215.    Defendant breached their fiduciary duties owed to Plaintiff and Class Members by maintaining sensitive data in legacy systems without adequate security measures.

216.    Defendant breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PII.

217.    As a direct and proximate result of Defendant's breaches of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails

-37-

to undertake appropriate and adequate measures to protect the PII in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

218.    As a direct and proximate result of Defendant's breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**SEVENTH CAUSE OF ACTION**
**Violation of California's Consumer Privacy Act**
**Cal. Civ. Code § 1798.150 *et seq.***
***(On Behalf of Plaintiff & the California Subclass)***

219.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

220.    Plaintiff brings this claim individually and on behalf of a California Subclass defined as all California residents whose personal information was compromised in the Data Breach.

221.    Defendant is a "business" as defined by Cal. Civ. Code § 1798.140(d) because it is a for-profit entity that collects consumers' personal information, does business in California, and meets the statutory thresholds for application of the CCPA.

222.    Plaintiff and California Subclass Members are "consumers" as defined by Cal. Civ. Code § 1798.140(i) as they are natural persons who are California residents.

223.    The PII compromised in the Data Breach constitutes "personal information" under Cal. Civ. Code § 1798.140(v), including but not limited to names, government-issued identification numbers, unique personal identifiers, and biometric information including photographs and facial recognition data.

224.    The photo identification documents and selfies stolen in the Data Breach specifically constitute "biometric information" under Cal. Civ. Code § 1798.140(b), which includes "imagery of the iris, retina, fingerprint, face, hand, palm, vein patterns, and voice recordings, from which an identifier template, such as a faceprint, a minutiae template, or a voiceprint, can be extracted, and

-38-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

keystroke patterns or rhythms, gait patterns or rhythms, and sleep, health, or exercise data that contain identifying information."

225.    Cal. Civ. Code § 1798.150(a)(1) creates a private right of action for any consumer whose nonencrypted and nonredacted personal information is subject to unauthorized access and exfiltration, theft, or disclosure as a result of a business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

226.    Defendant violated its duty to implement and maintain reasonable security procedures and practices by, among other things: (a) storing sensitive biometric and identification data in legacy systems; (b) failing to encrypt photo identification documents and biometric data; (c) failing to implement adequate access controls; (d) failing to monitor for unauthorized access; and (e) failing to comply with industry standard security practices.

227.    As a direct and proximate result of Defendant's violations of the CCPA, Plaintiff's and California Subclass Members' nonencrypted and nonredacted personal information, including biometric information, was subject to unauthorized access, exfiltration, theft, and disclosure.

228.    Plaintiff and California Subclass Members have suffered actual damages including, but not limited to: (a) lost or diminished value of their personal information, particularly their biometric data which cannot be changed; (b) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft; (c) lost opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (d) the continued risk to their personal information; (e) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the personal information compromised; and (f) the continued risk of identity theft and fraud created by their stolen photo identification being available on the various websites including 4Chan and X, and the dark web.

229.    To the extent Cal. Civ. Code § 1798.150(b)'s cure provision applies, Defendant cannot cure these violations because:

        a.    the stolen personal information, including photo identification documents and biometric data, has already been disseminated on the various websites including

4Chan and X, and upon information and belief, the dark web, and cannot be retrieved;

b.  biometric information such as facial features cannot be changed or replaced like passwords or credit card numbers;

c.  the harm from the unauthorized access has already occurred and cannot be undone; and

d.  Defendant cannot provide express written statement that the violations have been cured when the compromised data remains in the hands of unauthorized third parties.

230.    In the alternative, Plaintiff and California Subclass Members seek injunctive and declaratory relief pursuant to Cal. Civ. Code § 1798.150(b), which explicitly states that nothing in the statute affects consumers' rights to seek such relief.

231.    Pursuant to Cal. Civ. Code § 1798.150, Plaintiff and California Subclass Members seek actual damages, injunctive relief, declaratory relief, and any other relief the Court deems proper.

### EIGHTH CAUSE OF ACTION
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
***(On Behalf of Plaintiff & the California Subclass)***

232.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

233.    Plaintiff brings this claim individually and on behalf of the California Subclass.

234.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

235.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201 and was engaged in "business acts and practices" within the meaning of the UCL.

236.    Plaintiff and California Subclass Members are "persons" who have suffered injury in fact and lost money or property as a result of Defendant's violations of the UCL.

**Unlawful Prong**

237.    Defendant's conduct violates the UCL's "unlawful" prong by violating numerous state and federal laws, including but not limited to: a. The California Consumer Privacy Act, Cal. Civ. Code § 1798.100, et seq., by failing to implement reasonable security measures for personal and biometric information; b. The Customer Records Act, Cal. Civ. Code § 1798.81.5, by failing to implement and maintain reasonable security procedures and practices; c. California's data breach notification laws, Cal. Civ. Code § 1798.82, by failing to provide timely and adequate notice of the breach; d. Section 5 of the FTC Act, 15 U.S.C. § 45, by engaging in unfair practices that caused substantial consumer injury; e. California's constitutional right to privacy, Cal. Const. Art. I, § 1, by unreasonably intruding upon Plaintiff's and Class Members' privacy interests.

**Unfair Prong**

238.    Defendant's conduct independently violates the UCL's "unfair" prong. Defendant's practices were "unfair" because they were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

239.    Defendant's conduct was "unfair" in that: (a) it stored highly sensitive biometric and photo identification data in legacy systems known to have inadequate security; (b) it failed to encrypt sensitive biometric data despite industry standards requiring such protection; (c) it collected more sensitive data than necessary for its services, including government-issued photo identification; (d) it retained sensitive data longer than necessary; and (e) it prioritized cost savings over data security by maintaining inadequate legacy systems.

240.    The harm to Plaintiff and California Subclass Members from having their photo identification and biometric data stolen and disseminated on various websites including 4Chan and X, and likely the dark web, far outweighs any utility of Defendant's conduct. There is no legitimate business justification for storing such sensitive data in unencrypted legacy systems.

241.    Defendant's conduct also violates established public policy as declared by specific constitutional, statutory, and regulatory provisions, including California's strong public policy favoring privacy protection and data security as embodied in the California Constitution, CCPA, and other privacy laws.

242.    Plaintiff and California Subclass Members could not have reasonably avoided the harm because they had no way of knowing that Defendant stored their sensitive biometric and identification data in inadequate legacy systems without proper encryption.

**Fraudulent Prong**

243.    Defendant's conduct violates the UCL's "fraudulent" prong because Defendant's representations and omissions regarding its data security practices were likely to deceive reasonable consumers.

244.    Defendant represented in its privacy policy and terms of service that it employed "reasonable security measures" to protect personal information, when in fact it stored sensitive biometric and identification data in legacy systems without adequate protection.

245.    Defendant omitted material facts regarding its security practices, including that: (a) it stored sensitive data in legacy systems; (b) it failed to encrypt photo identification and biometric data; (c) its security measures fell below industry standards; and (d) it had not implemented adequate monitoring and access controls.

246.    Had Plaintiff and California Subclass Members known the truth about Defendant's inadequate security practices, particularly regarding the storage of their photo identification and biometric data, they would not have provided such sensitive information to Defendant or used its services.

247.    As a direct and proximate result of Defendant's violations of the UCL, Plaintiff and California Subclass Members have suffered injury in fact and have lost money or property, including but not limited to: (a) the loss of their legally protected interest in the confidentiality and privacy of their personal information; (b) out-of-pocket costs associated with identity theft mitigation; (c) the value of their time spent dealing with the breach; (d) diminished value of the services they purchased; and (e) the loss of value of their personal information.

248.    Defendant's violations of the UCL are ongoing and present a continuing threat to Plaintiff and California Subclass Members as their personal information, particularly their immutable biometric data, remains on various websites including 4Chan and X and likely the dark web, and in Defendant's inadequately secured systems.

249.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and California Subclass Members seek an order enjoining Defendant from continuing to engage in unfair competition and any other act prohibited by law, including those acts prohibited by the UCL.

250.    Plaintiff and California Subclass Members also seek restitution and disgorgement of all revenues, earnings, profits, compensation, and benefits that Defendant obtained from Plaintiff and California Subclass Members as a result of its unlawful, unfair, and fraudulent business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204

**NINTH CAUSE OF ACTION**
**Declaratory Judgement**
***(On Behalf of Plaintiff & the Class)***

251.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

252.    An actual controversy has arisen and now exists between Plaintiff and Class Members on the one hand, and Defendant on the other, concerning their respective rights and duties with respect to the Data Breach and Defendant's data security obligations going forward.

253.    Plaintiff and Class Members contend that Defendant's data security measures were and remain inadequate, particularly its use of legacy systems, and that Defendant has ongoing duties to implement and maintain reasonable safeguards to protect their PII that remains in Defendant's possession.

254.    Plaintiff and Class Members further contend that Defendant has not adequately remediated the security vulnerabilities that led to the Data Breach, particularly with respect to legacy systems, and that their PII remains at imminent risk of further unauthorized access and disclosure.

255.    Defendant has not provided adequate assurances that it has implemented sufficient security measures to prevent future breaches or that all copies of the exfiltrated data, including photo identification documents, have been recovered or destroyed.

256.    Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and legal relations of the parties to this action.

-43-

257.    A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties with respect to:

    a.  Whether Defendant's current data security measures are adequate to protect Plaintiff's and Class Members' PII;

    b.  Whether Defendant must eliminate the use of legacy systems for storing sensitive PII;

    c.  Whether Defendant must implement specific industry-standard security measures and protocols;

    d.  Whether Defendant must submit to regular third-party security audits and assessments;

    e.  Whether Defendant must provide ongoing credit monitoring and identity theft protection services to Class Members;

    f.  Whether Defendant must destroy or return any unnecessary PII in its possession, particularly photo identification documents; and

    g.  Whether Defendant must provide complete and transparent reporting regarding the Data Breach and remediation efforts.

258.    Plaintiff and Class Members have no adequate remedy at law for Defendant's ongoing failure to implement adequate security measures, making declaratory relief appropriate.

259.    Accordingly, Plaintiff and Class Members seek a declaration of their rights and Defendant's corresponding duties regarding data security practices and breach remediation measures.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Charlotte Vargas, on behalf of herself and all persons similarly situated, prays for judgment in her favor and against Defendant Tea Dating Advice Inc., and respectfully requests that this Honorable Court enter an order:

A.  Certifying this action as a Class action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

B.  Granting equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.  Granting equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D.  Granting equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.  Requiring Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

F.  Awarding actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.  Awarding punitive damages, as allowable by law;

H.  Awarding attorneys' fees and costs under the common fund doctrine, and any other applicable law;

I.  Awarding costs and any other expense, including expert witness fees, incurred by Plaintiff in connection with this action;

J.  Awarding relief under the California Consumer Privacy Act, Cal. Civ. Code § 1798.150, including actual damages and injunctive relief;

K.  Awarding restitution and disgorgement of all revenues, earnings, profits, compensation, and benefits that Defendant obtained from Plaintiff and Class Members as a result of its unlawful, unfair, and fraudulent business practices pursuant to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17203 and 17204;

L.  Granting an order enjoining Defendant from continuing to engage in unfair competition and any other act prohibited by the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17203;

M.  Awarding pre- and post-judgment interest on any amounts awarded; and

-45-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

N.  All such other and further relief as this court may deem just and proper.

Dated: August 7, 2025                          Respectfully submitted,


                                               */s/  Matthew J. Langley*
                                               Matthew J. Langley (CBN 342846)
                                               **ALMEIDA LAW GROUP LLC**
                                               849 W. Webster Avenue
                                               Chicago, Illinois 60614
                                               (773) 554-9354
                                               Email: matt@almeidalawgroup.com

                                               David S. Almeida*
                                               Elena A. Belov*
                                               **ALMEIDA LAW GROUP LLC**
                                               849 W. Webster Ave.
                                               Chicago, Illinois 60614
                                               Tel.: (708) 437-6476
                                               david@almeidalawgroup.com
                                               elena@almeidalawgroup.com

                                               *Pro hac vice application forthcoming*


                                               *Attorneys for Plaintiff & the Putative Class*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1

2    **JURY TRIAL DEMANDED**

3          Plaintiff demands a trial by jury for all issues so triable.

4

5    Dated: August 7, 2025

6    Respectfully submitted,

7

8

9                                              */s/  Matthew J. Langley*
                                               Matthew J. Langley
10                                             California Bar No. 342846
11                                             **ALMEIDA LAW GROUP LLC**
                                               849 W. Webster Avenue
12                                             Chicago, Illinois 60614
                                               (773) 554-9354
13                                             Email: matt@almeidalawgroup.

14                                             David S. Almeida*
15                                             **ALMEIDA LAW GROUP LLC**
                                               849 W. Webster Ave.
16                                             Chicago, Illinois 60614
                                               Tel.: (708) 437-6476
17                                             david@almeidalawgroup.com

18

19                                             *Pro hac vice application forthcoming*
                                               *Attorneys for Plaintiff & the Putative Class*
20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL